**WSB, INC., Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**NewCity Communications of Massachusetts, Inc., Intervenor.**

No. 95–1289.

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 1996.

Decided June 14, 1996.

Kevin F. Reed, Washington, DC, argued the cause, for the appellant.

Clifford G. Pash, Jr., Counsel, Federal Communications Commission, Washington, DC, argued the cause, for the appellee. William E. Kennard, General Counsel, and John E. Ingle, Deputy Associate General Counsel, Washington, DC, were on brief. Daniel M. Armstrong, Associate General Counsel, Washington, DC, entered an appearance.

Irving Gastfreund, Washington, DC, entered an appearance, for the intervenor.

Before: BUCKLEY, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The owner of an Atlanta television station wants to purchase a radio station that is licensed to La Grange, Georgia but is also heard in Atlanta. Before asking the Federal Communication Commission (FCC) to approve the broadcast license transfer, the radio station's current owner sought the FCC's permission to modify the station's radio signal so that a small area of Atlanta no longer received the signal. The FCC denied the request because the radio station owner's reason for the requested signal change was to allow the television station owner's purchase of the radio station to meet FCC multiple media ownership rules. The FCC also denied the television station owner's subsequent request for a waiver. The television station owner appeals from the FCC's consolidated order, arguing primarily that the FCC's rationale for denying both the modification and the waiver requests was arbitrary. We disagree and affirm the FCC.

## Background

This case involves the efforts of Cox Enterprises, Inc. (Cox) to buy commercial radio station WJZF (FM)[1] (WJZF radio) from NewCity Communications of Massachusetts, Inc. (NewCity). Cox owns an Atlanta VHF television station (WSB–TV), two Atlanta radio stations (WSB–AM and WSB–FM) and two Atlanta daily newspapers (*The Atlanta Constitution* and *The Atlanta Journal*). NewCity broadcasts WJZF radio from an antenna located between Atlanta and La Grange, Georgia. Although WJZF radio's "community of license" is La Grange, and it must therefore provide that small rural community with a strong radio signal, *see* 47 C.F.R. § 73.315 (1994), WJZF radio is also heard throughout Atlanta. Cox would own six significant Atlanta media sources if allowed to purchase WJZF radio.

Cox's proposed purchase of WJZF radio implicates two of the FCC's media ownership rules.[2] *See* 47 U.S.C. § 310(d) (requiring FCC approval to transfer radio broadcast license). The FCC enforces local media ownership restrictions to promote diversity of views and programming as well as to "prevent undue concentration of economic power" in a particular community.[3] *See In re Amendment of Section 73.3555 of the Commission's Rules, the Broadcast Multiple Ownership Rules,* 4 F.C.C.R. 1741, 1745 (1989); *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 781, 98 S.Ct. 2096, 2105, 56 L.Ed.2d 697 (1978). Under its "one-to-a-market rule," the FCC will not grant a commercial radio license to a company that already owns a local television station. *See* 47 C.F.R. § 73.3555(c) (1994). Similarly, under its "daily newspaper cross-ownership rule," the FCC will not grant a commercial radio license to a company that already owns a local daily newspaper. *See* 47 C.F.R. § 73.3555(d). The multiple ownership rules prohibit the owner of a community's television station or daily newspaper

---

1. Formerly WYAI.

2. Although Cox owns two radio stations, its purchase of WJZF radio would not violate the radio duopoly rule because of the stations' combined audience size. *See* 47 C.F.R. § 73.3555(a)(1)(ii) (permitting joint ownership of up to 2 AM and 2 FM stations in large radio markets provided

combined audience share is less than 25 per cent).

3. Similar FCC rules promote the same goals at the national level. *See, e.g.,* 47 C.F.R. § 73.3555(e)(1) ("National multiple ownership rule").

from also owning a radio station that "encompasses" the community.[4]

Cox's and NewCity's initial strategy for gaining FCC approval of their transaction was to modify WJZF radio's signal so that the station would no longer "encompass" Atlanta. Because Cox already owns one Atlanta television station and two Atlanta newspapers, both the "one-to-a-market" and the "newspaper cross-ownership" rules prohibit Cox from acquiring a radio station which has a signal "encompassing" Atlanta; Atlanta is both the "community of license" and the "community in which such newspaper is published" for Cox's television station and daily newspapers respectively.[5] WJZF radio's signal encompasses Atlanta and thus Cox could not own the station. Undaunted, NewCity submitted to the FCC a Minor Change Application asking for permission to modify WJZF radio's signal so that a "sliver" of Atlanta would no longer receive the signal.[6] Because the modified signal would no longer encompass Atlanta, the multiple ownership rules would not prevent Cox from purchasing WJZF radio.

On August 11, 1993 the Chief of the Mass Media Bureau's Audio Services Division granted NewCity permission to modify the radio signal. Jacor Broadcasting, Inc. (Jacor), a licensee of two Atlanta radio stations (WGST (AM) and WPCH (FM)), objected to NewCity's modification request and petitioned the FCC for review of the decision. Before the FCC ruled on the modification request, NewCity and Cox asked the FCC to approve NewCity's assignment of the modified WJZF radio to WSB, Inc., a wholly owned subsidiary of Cox.

In response to the assignment application, the Chief of the FCC's Mass Media Bureau asked NewCity and Cox to submit materials establishing that Cox's ownership of *unmodified* WJZF radio qualified for waivers from the FCC's multiple ownership rules. Cox and NewCity requested that the FCC grant Cox "case-by-case" waivers to allow it to purchase WJZF radio. *See* 4 F.C.C.R. at 1744 (describing criteria for granting "case-by-case" waiver from multiple ownership rules in light of "dramatic increase in the number of media outlets in markets of all sizes, which has enhanced both viewpoint and programming diversity on a local level").

On May 5, 1995 the FCC issued a consolidated order reversing the Mass Media Bureau's approval of the modification request and denying the assignment request. *New-City Communications of Mass., Inc.*, 10 F.C.C.R. 4985 (1995). The FCC agreed that Cox could purchase a modified WJZF radio because as modified the station would not encompass Atlanta. The FCC denied the modification request, however, because the purpose of the request was to allow Cox to buy the radio station. The FCC decided against waiving the one-to-a-market rule (it did not reach the waiver request regarding the newspaper cross-ownership rule) and denied NewCity's request to assign WJZF radio to Cox. Cox's appeal, in the name of WSB, Inc., followed.

### Modification Request

■ The FCC claims that a procedural lapse prevents us from reviewing Cox's ap-

---

**4.** The "one-to-a-market ownership rule" states in part:

No license for an AM, FM or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates or controls one or more such broadcast stations and the grant of such license will result in: . . . The predicted 1 mV/m contour of an existing or proposed FM station . . . encompassing the entire community of license of an existing or proposed TV broadcast station(s), or the Grade A contour(s) of the TV broadcast station(s) . . . encompassing the entire community of license of the FM station.

47 C.F.R. § 73.3555(c). The newspaper cross-ownership rule is similar except that it refers to the "community in which such newspaper is

published" rather than the "community of license." *See* 47 C.F.R. § 73.3555(d).

**5.** Cox's ownership of WSB–TV, WSB–FM and WSB–AM is exempt from the FCC multiple ownership rules because Cox owned the stations before the FCC rules became effective. *See* 47 C.F.R. § 73.3555 n.4 (multiple ownership rules shall "not be applied so as to require divestiture, by any licensee, of existing facilities").

**6.** NewCity requested permission to change the station's transmitter from "omnidirectional" to "directional." Eighty thousand Atlanta residents, three per cent of WJZF radio's current audience, would no longer receive the radio signal if the transmitter were so modified.

peal from the denial of NewCity's modification request. Section 405(a) of the Communications Act of 1934 (Act) reads:

> The filing of a *petition for reconsideration shall not be a condition precedent to judicial review* of any [FCC] order, decision, report, or action *except where the party seeking such review* (1) *was not a party to the proceedings resulting in such order, decision, report, or action,* or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.

47 U.S.C. § 405(a) (emphasis added). The FCC argues that Cox "was not a party" to the modification application. Cox did not petition for reconsideration of the FCC's reversal dismissing the modification application and the agency therefore concludes that under section 405(a)(1) we cannot review Cox's challenge to its denial of NewCity's modification application.

Although silent before the staff decision to approve NewCity's modification request, Cox defended that decision before the FCC. After Jacor petitioned for review, the FCC sent Cox and NewCity a letter "in reference to the recently granted application to modify the facilities of [WJZF], La Grange, Georgia, and the pending application to assign the license of [WJZF]." Joint Appendix (JA) 226. The letter noted "the Commission's traditional concern with facilities modifications designed solely to avoid overlap problems under the multiple ownership rules." *Id.* Cox defended the initial decision to approve NewCity's proposed modification. The FCC's consolidated order addressed Cox's arguments regarding the modification application. 10 F.C.C.R. at 4987. These circumstances cause us to conclude that Cox "par-

ticipated in the proceedings" involving NewCity's modification request.[7] We therefore turn to the merits of the FCC's modification decision.

■ The FCC denied NewCity's modification request because the request was " 'designed solely to avoid overlap problems.' " 10 F.C.C.R. at 4986. Cox claims that the FCC's refusal to approve NewCity's modification request was such a departure from FCC precedent that it was an abuse of discretion. We disagree.

Cox first argues that the FCC arbitrarily relied on inapplicable precedent. The FCC cited two decisions, *Huron Shores Broadcasting Corp.,* 53 F.C.C.2d 216, 217 (1975), and *Jones T. Sudbury,* 4 Rad. Reg.2d (P & F) 679, 680 (FCC 1965), in support of its rationale. Repeating language from *Sudbury,* the FCC stated in *Huron:* "[T]he Commission is concerned about proposed modifications designed solely to avoid overlap problems." 53 F.C.C.2d at 217. Cox claims the two decisions are inapplicable because they both, it appears, involved rural communities with few radio stations.[8] In contrast, Atlanta is an urban city with nineteen licensed commercial radio stations. As the FCC concluded, however, "[t]here is nothing in the two cases that limits the broad language proscribing modifications requested for the sole purpose of avoiding the multiple ownership rules to the circumstances of those cases." 10 F.C.C.R. at 4987. Cox's attempt to distinguish *Huron* and *Sudbury* based on facts not even mentioned in those orders does not come close to convincing us that the FCC acted arbitrarily in relying on its two earlier decisions to deny NewCity's modification request.

---

7. Accepting the FCC's argument would also require us to ignore the holding in *Office of Communication of the United Church of Christ v. FCC,* 779 F.2d 702 (D.C.Cir.1985). In that case, we relied on *Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677 (D.C.Cir.1983) (*WATCH*) to hold that "Section 405 simply codifies the common law exhaustion requirement." 779 F.2d at 707. The FCC asks us to disavow the *UCC* decision because in that case we purportedly disregarded the statutory text and instead relied on *WATCH,* a case interpreting sec-

tion 405(a)(2), not (a)(1). (Appellee's Br. at 17 n.9.) ("We believe that this decision [*UCC*] was in error.") We considered and rejected the same arguments in *UCC* itself. *See* 779 F.2d at 706–07 (quoting language of statute and acknowledging different provision at issue in *WATCH*).

8. The FCC orders in *Huron* and *Sudbury* omitted these facts; Cox apparently reviewed the parties' original documents, now some twenty to thirty years old. (Appellant's Br. at 26–27.)

Cox also claims that the FCC has "implicitly" overruled *Huron*. (Appellant's Br. at 24.) The FCC "allots" radio frequencies to specific communities.[9] Because a commercial station depends on advertising for income, it is often more lucrative for a broadcaster to provide radio service to an urban community than to a rural community even if the urban area has multiple stations and the rural area none.[10] *See Communications Investment Corp. v. FCC*, 641 F.2d 954, 964 (D.C.Cir.1981) ("It is to be expected that broadcasters will constantly apply whatever pressure they can bring to bear to get FCC approval for placement of their stations as close to the heart of a major population center as possible.") To prevent a broadcaster from applying for a license allotted to a small community while intending to profit from a nearby urban area, the FCC developed a collection of policies to determine "which community an applicant actually intended to serve."[11] *The Suburban Community Policy, the Berwick Doctrine, and the De Facto Reallocation Policy*, 93 F.C.C.2d 436, 437 (1983); *see Communications Investment Corp.*, 641 F.2d at 967. In its *Suburban Community Policy* decision, however, the FCC repealed the community policies because the increased requirements delayed approval of proposed stations, causing the policies to thwart rather than further the statutory goal of making radio more available to different communities.[12] Cox argues that repeal of the community policies also repeals *Huron* because both involved regulating the intent behind a proposed modification or assignment.

In its order below, the FCC declared that it has not "overruled or modified" *Huron* and *Sudbury*. 10 F.C.C.R. at 4987. Although both the community policies and the multiple ownership rules affect a broadcaster's modification request, they have different rationales. The community policies sought to prevent *communities* from having all the broadcast media; the multiple ownership rules prevent *individuals* from having all the broadcast media. *Compare Communications Investment Corp.*, 641 F.2d at 965 ("If left to their own devices broadcasters would congregate around the biggest city in the area.") *with Astroline Communications Co. v. FCC*, 857 F.2d 1556, 1558 (D.C.Cir.1988) ("The one-to-a-market rule reflects the Commission's commitment to diversity in ownership and control of broadcast licenses."). Abandoning a regulatory method (monitoring the reason for a proposed modification) because it no longer serves a regulatory goal (increasing the number of served communities) does not require the FCC to jettison the regulatory method altogether if the method continues to further a separate regulatory goal (increasing the number of station owners). We defer

9. The Act requires the FCC to "make such distribution of licenses, frequencies, hours of operation and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). *See National Broadcasting Co. v. United States*, 319 U.S. 190, 217, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943) (describing goal of Act to "secure the maximum benefits of radio to all the people of the United States"); *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 359–62, 75 S.Ct. 855, 856–58, 99 L.Ed. 1147 (1955) (describing section 307(b) goal "to secure local means of expression"); 47 C.F.R. § 73.202(b) (allotting FM channels to communities across country).

10. WJZF's radio frequency is licensed to La Grange but its radio antenna is located halfway between La Grange and Atlanta.

11. *See, e.g., Policy Statement on Section 307(b) Considerations for Standard Broadcast Facilities Involving Suburban Communities*, 2 F.C.C.2d 190, 193 (1965) (suburban community policy); *Berwick Broadcasting Corp.*, 20 F.C.C.2d 393 (1969), *modifying* 12 F.C.C.2d 8 (1968), *on remand, P.A.L. Broadcasters, Inc.*, 40 F.C.C.2d 546 (1973) (*Berwick* policy); *Hall Broadcasting Co., Inc.*, 40 F.C.C.2d 546 (1973) (de facto reallocation policy). For example, if an applicant for an AM license proposed a radio signal that covered both the community of license and an urban community, the presumption was that the applicant intended to serve the urban community, a presumption the applicant could rebut by showing it planned to serve the distinctive programming needs of the suburban community. *See Beaufort County Broadcasting Co. v. FCC*, 787 F.2d 645, 650–53 & n. 6 (D.C.Cir.1986).

12. Instead, the FCC decided that "a renewal challenge for failure actually to serve the designated community constitutes a more effective regulatory tool than utilization in advance of guidelines and factors that are inexact in divining intent." *Suburban Community Policy*, 93 F.C.C.2d at 437.

to the FCC's decision to reaffirm *Huron* and *Sudbury.*[13]

Cox complains that this holding will result in the "cruel irony" of punishing it for pursuing the assignment request too soon after the modification request. (Appellant's Rep. Br. at 3 n.6.) Had Cox waited more than the eleven weeks it did to file the assignment request, the FCC might not have known the reason for the modification and thus might well have allowed the modification. Nevertheless, it is far from clear that delay would have allowed Cox to own the station. Even if the FCC had approved NewCity's modification request, Cox's subsequent—albeit delayed—assignment request would have revealed that the reason for NewCity's modification was to make Cox's ownership of the station fit the multiple ownership rules. The FCC might well have decided not to approve an assignment application which complied with the multiple ownership rules solely because of a (much) earlier modification made to facilitate the subsequent assignment. *Cf. NLRB v. American Geri–Care, Inc.,* 697 F.2d 56, 60 (2d Cir.1982) (upholding NLRB finding based on "stunningly obvious" timing of employer's actions).

## Waiver Request

■ The FCC's case-by-case approach to a requested waiver from the multiple ownership rules weighs five factors.[14] Because WJZF radio is a powerful "Class C1" station and Cox already owns multiple media sources, the FCC decided that neither the broadcast power of the radio station nor the owner's other media holdings supported a waiver. 10 F.C.C.R. at 4989. Cox did not assert that the radio station was facing financial hardship so the third factor did not support granting a waiver. The FCC acknowledged that the proposed transaction might not increase media concentration in Atlanta but stated that this factor alone did not justify granting the waiver (otherwise the case-by-case waiver approach could become a large-market general exception—*see infra*). The FCC dubbed Cox's proposals to increase WJZF radio's public service programming and to start a minority training program "minor." *Id.* at 4990. It also doubted that joint ownership would produce "economies of scale," another alleged public benefit, because Cox operates all of its radio and television stations independently.

Cox thus has little claim to a waiver, as its belated request suggests, and its arguments on appeal have no merit. *See* 4 F.C.C.R. at 1753 ("Waiver requests forwarded by applicants who already own a number of media outlets in the relevant market will have a higher hurdle than those from applicants with few outlets."); *WAIT Radio,* 459 F.2d at 1207 (waiver applicant faces "high hurdle"). The FCC did not ignore evidence of the lack of competitive harm caused by the proposed purchase—it rejected the waiver request even assuming there was no competitive harm. 10 F.C.C.R. at 4990. Cox also claims that the FCC departed from standards applied in earlier waiver cases in denying Cox's waiver request but Cox provides not a single case where the FCC granted a cross ownership case-by-case waiver to a buyer with a similar market position to Cox's and with similar public benefits. On the other hand, the FCC can point to precedent supporting its decision to deny Cox's waiver request. *See Kargo Broadcasting, Inc.,* 5 F.C.C.R. 3442 (1990) (denying case by case waiver to owner of Salt Lake City newspaper and television stations).

Although the proposed transaction would provide little public benefit, we are skeptical that blocking the transaction does much for

---

**13.** The FCC also denied the modification request because it proposed reducing service to 80,000 people without providing an offsetting public benefit. 10 F.C.C.R. at 4987. Because we uphold the FCC based on its policy of diffused ownership, we need not decide whether the service loss constitutes a separate ground on which to deny the modification request.

**14.** The factors are: (1) the public benefits of common ownership; (2) the type (i.e. broadcast power) of facilities involved; (3) the financial status of the station to be purchased; (4) the number of stations the applicant already owns in the market; and (5) diversity in the market if the purchase is approved. A strong showing based on one factor can compensate for a weak, or no, showing based on another factor. *See Kargo Broadcasting, Inc.,* 5 F.C.C.R. 3442 (1990).

the public weal either. In the same order creating the "case-by-case" waiver, the FCC stated it intended to "look favorably" on common ownership of radio and television stations if the stations are located in large urban areas where there are many independent stations ("top 25 markets/30 voices" test).[15] The presumptive waiver rule would apply to the Atlanta media market (Atlanta is the tenth largest television market and has over forty independent stations) and so one might think that Cox's proposed ownership of WJZF radio would clear the hurdle, high as it is. In *Revision of Radio Rules and Policies*, 7 F.C.C.R. 6387 (1992), however, the FCC in a brief footnote rejected the suggestion that the top 25 markets/30 voices exception apply to a television owner seeking to acquire a *second* local radio station.[16] It escapes us why Cox's ownership of WJZF radio is more threatening to the public interest because of its ownership of other radio stations or, more generally, why the proposed assignment is inimical to the public interest notwithstanding Cox's other media holdings. *See* 10 F.C.C.R. at 4992 (Quello, Comm'r, concurring) ("I am also somewhat baffled as to why Cox's purchase of an additional FM station should be denied in light of the vast array of other radio, television, [and] cable ... available in Atlanta."). The FCC is of course free to decide, as it did in *Huron*, that "fixed overlap standards [are] vastly superior to an ad hoc approach," 53 F.C.C.2d at 216, but where, as here, neither the general rule nor its specific application may serve the public interest the FCC arguably steps outside its statutory role. *See* 47 U.S.C. § 307(a) ("The Commission, if the public con-

venience, interest, or necessity will be served thereby ... shall grant to any applicant therefor a station license.") Cox, however, never asked for a top 25 markets/30 voices waiver.

For the preceding reasons, we affirm the FCC's consolidated order denying both NewCity's modification request and Cox's assignment application.

*Affirmed.*

---

**15.** This "presumptive waiver" rule is "based on the fact that a very large number of broadcast outlets and separate voices will remain in these large markets, thereby preventing any single outlet or firm from obtaining undue economic power or undue sway over public opinion. Indeed, we believe that our 'top 25 markets/30 voices' standard is conservative and may far exceed the market size and the number of voices necessary to ensure diversity and prevent competitive abuses." 4 F.C.C.R. at 1751. *See* Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, 111, sec. 202(d) (instructing FCC to extend its presumptive waiver policy to top 50 markets "consistent with the public interest, convenience, and necessity").

**16.** The footnote reads in full:

In addition, we note that CapCities/ABC requests that the Commission extend the application of the top 25 markets/30 voices test (one-to-a-market waiver process) to television licensees who propose to acquire more than one radio station in a community in the same service. Possible revisions to the one-to-a-market prohibition, including the impact of revised ownership limits, are being addressed in the Commission's television ownership proceeding. Until the issue is resolved, we will consider waiver requests using the case-by-case waiver approach, taking into account our general conclusions in this proceeding regarding the public interest in a strengthened radio service.

7 F.C.C.R. 6387 n. 40 (citations omitted).