**STATE OF WISCONSIN, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Kimberly–Clark Corporation and N.E.W. Hydro, Inc., Intervenors.**

Nos. 96–1086, 96–1087.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1996.

Decided Jan. 17, 1997.

John C. Scherbarth, Assistant Attorney General, State of Michigan, Lansing, MI, argued the cause, for petitioner Kelley, with whom Thomas J. Casey, Solicitor General, State of Michigan, was on the briefs.

Frank D. Remington, Assistant Attorney General, Wisconsin Department of Justice, Madison, WI, argued the cause and filed the briefs, for petitioner State of Wisconsin.

Joel M. Cockrell, Attorney, Federal Energy Regulatory Commission, argued the cause, for respondent, with whom Jerome M. Feit, Solicitor, Washington, DC, and Joseph S. Davies, Deputy Solicitor, were on the brief. Jill L. Hall, Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge Rogers.

ROGERS, Circuit Judge:

In these consolidated petitions for review of two orders of the Federal Energy Regulatory Commission ("FERC"),[1] the Department of Natural Resources of the State of Wisconsin ("Wisconsin") and the Department of Natural Resources of the State of Michigan ("Michigan") challenge FERC's approval of two license transfers for hydroelectric projects. Petitioners contend that, in order to protect the public interest, FERC should have inquired further into the financial capability of the license transferee to operate the two dams, particularly in light of the expected cost of future environmental measures likely to be required for the dams' continued operation. Petitioners are concerned that in the event the dams become economically unviable and the transferee decides to abandon the facilities at the termination of the existing licenses, the transferee may lack sufficient financial resources to cover the costs of decommissioning the dams,[2] and the burden of those costs will then fall on the taxpayers of their states. While Michigan challenges FERC's decision approving the transfer of one dam as arbitrary and capricious, and unsupported by substantial evidence in the record, Wisconsin objects both procedurally and substantively to FERC's decisions with regard to both dams. Petitioners seek a remand with instructions to FERC to investigate further the financial capability of the transferee and to provide the financial records to the petitioners for their review. We conclude that the procedural challenges are meritless and that the factual determinations challenged by petitioners are supported by substantial evidence in the record. Because petitioners have not pointed to specific factual evidence to support their challenges to the financial capability of the transferee, or adduced any evidence to raise serious concern about FERC's determinations, we further conclude that FERC could rationally decide to defer consideration of the cost of potential environmental protection measures until they become necessary at the time of relicensing, and to decline to require the transferee to submit its financial records. Accordingly, we deny the petitions.

## I.

Congress has designed in the Federal Power Act, 16 U.S.C. §§ 791a–825r, "a complete scheme of national regulation" to "promote the comprehensive development of the water resources of the Nation." *First Iowa Hydro–Elec. Co-op. v. Federal Power Commission,* 328 U.S. 152, 172 n. 17, 180, 66 S.Ct. 906, 915 n. 17, 919, 90 L.Ed. 1143 (1946). Vesting authority in FERC to oversee the

---

1. Scott Paper Co. and N.E.W. Hydro, Inc., 72 FERC ¶ 62,063 (1995), *reh'g denied,* 74 FERC ¶ 61,024 (1996); Menominee Co. and N.E.W. Hydro, Inc., 72 FERC ¶ 62,065 (1995), *reh'g denied,* 74 FERC ¶ 61,023 (1996).

2. "Possible forms of decommissioning extend from simply shutting down the power operations to tearing out all parts of the project, including the dam, and restoring the site to its pre-project condition." *See* Policy Statement on Project Decommissioning at Relicensing, 60 Fed.Reg. 340 n.1 (1995) (referenced in 18 C.F.R. § 2.24).

development of water resources, the Act provides that any entity proposing to build a hydroelectric project "across, along, or in any of the navigable waters of the United States" must obtain a license from FERC. 16 U.S.C. § 817(1). Licenses are issued for terms up to fifty years, at the end of which time FERC may issue a new license to the existing or a new licensee, authorize a federal take-over of the project, or provide for the decommissioning of the project. *See id.* §§ 799, 808(a).

The Federal Power Act provides that during the term of a license, a licensee cannot voluntarily transfer the license or any rights granted thereunder "without the written approval of the commission." *Id.* § 801. Under FERC regulations, a licensee seeking to transfer its license or its rights, and a person desiring to acquire such license or rights, "shall jointly or severally file an application for approval of such transfer and acquisition." 18 C.F.R. § 9.1. Each transfer application must include "in appropriate detail the qualifications of the transferee to hold such license and to operate the property under license, which qualifications shall be the same as those required of applicants for license." *Id.* § 9.2. FERC's approval of a license transfer "is contingent upon the transfer of title to the properties under license, delivery of all license instruments, and a showing that such transfer is in the public interest." *Id.* § 9.3(a). The transferee is thereafter subject to all relevant Federal Power Act provisions as well as conditions contained in the license, to the same extent as if it were the original licensee. *Id.*

Pertinent to these appeals, FERC issued two thirty-year licenses that it subsequently allowed to be transferred to a new party. First, in 1985 FERC issued a thirty-year license to the Menominee Company ("Menominee"), a subsidiary of Scott Paper Company ("Scott"), for the Menominee/Park Mill Hydroelectric Project, a 4.615 megawatt project on the Menominee River in Marinette County, Wisconsin, and Menominee County, Michigan. *Menominee Co.,* 30 FERC ¶ 62,-264 (1985). Second, in 1994 FERC issued a thirty-year license to Scott for the Oconto Falls Hydroelectric Project, a 1.8 megawatt project on the Oconto River, Oconto County, Wisconsin. *Scott Paper Co.,* 67 FERC ¶ 72,-118 (1994). Sometime prior to March 1995, Menominee and N.E.W. Hydro, Inc. ("NEW") negotiated the sale of the two hydroelectric dams crossing the Menominee and Oconto Rivers. To facilitate the sale, on March 7, 1995, Scott and NEW filed a joint application pursuant to § 8 of the Federal Power Act, 16 U.S.C. § 801, requesting FERC's approval of the transfer of both licenses to NEW as part of the sale of the assets of the projects. In the application, Scott and NEW represented that they had executed an agreement on January 20, 1995, that provided that Menominee and Scott would purchase net electrical energy from NEW for a period of ten years. They also stated that NEW was qualified to hold the license and was ready, willing, and able to operate and maintain the projects.

FERC gave public notice of the applications on March 20, 1995, and set a comment deadline of April 6, 1995. 60 Fed.Reg. 15,556 (1995); 60 Fed.Reg. 15,556–01 (1995). Wisconsin intervened in opposition to the proposed transfer of the licenses for both projects, and Michigan intervened in opposition to the Menominee transfer. Expressing concern about the financial capability of NEW, particularly because, under a fisheries plan developed for the Menominee River, it was expected that by 2015 costly fish passage facilities would need to be installed at the Menominee/Park Mill Project, Wisconsin argued that before the license was transferred, NEW should be required "to provide proof of financial responsibility thus ensuring the continued maintenance, or possible removal, of the dam in the event the licensee is unable to provide the necessary financial resources." Michigan, citing unresolved recreational access and fish protection issues, stated, without elaboration, that its concerns were heightened by the financial status of NEW and by NEW's compliance history in Michigan.

The Director of FERC's Division of Project Compliance and Administration approved the license transfers, recounting the concerns expressed by Michigan and Wisconsin but noting that NEW was "bound by all

terms and conditions of the license as though it were the original licensee." Acknowledging that it was FERC's policy to scrutinize applications seeking to transfer licenses for economically marginal projects to prevent transfers to licensees lacking sufficient financial resources to maintain the projects, the Division Director found this policy to be inapplicable to the transfer applications of the Menominee/Park Mill and Oconto Projects because they were economically viable and decommissioning was not reasonably anticipated within the remaining term of the licenses. The Division Director noted FERC's independent determinations, at the time of the issuance of the initial licenses, of the projects' economic viability as well as NEW's ten-year power purchase agreements with Menominee and Scott. Wisconsin and Michigan filed for rehearing on the grounds that the Division Director's orders did not adequately address their concerns, including the need for environmental protection measures and for an assessment of the financial capabilities of NEW. FERC denied rehearing, emphasizing the Division Director's two grounds for approving the transfer and rejecting Michigan's projections with respect to NEW's financing costs and revenues for the two projects.

## II.

■ This court's review of FERC's approval of license transfers is deferential. *See U.S. Dept. of the Interior v. FERC*, 952 F.2d 538, 543 (D.C.Cir.1992); *see also Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1524 (D.C.Cir.1994). "In a licensing decision such as this, where few explicit statutory provisions govern, our role is narrowly circumscribed." *Mine Reclamation*, 30 F.3d at 1524. The court will deny a petition for review " 'so long as [FERC's] decision is supported by substantial evidence in the record and reached by reasoned decisionmaking.' " *Id.* at 1524 (quoting *Electricity Consumers Resource Council v. FERC*, 747 F.2d 1511, 1513 (D.C.Cir.1984)). This requires "an examination of relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Dept. of Interior*, 952

F.2d at 543 (quoting *Electricity*, 747 F.2d at 1513).

Wisconsin and Michigan jointly contend that FERC's approval of the license transfers was unsupported by substantial evidence. Wisconsin focuses principally on procedural issues, maintaining that it was not afforded access to documents on which FERC relied and that it was denied the opportunity for an evidentiary hearing. Michigan's challenge focuses more substantively on the evidence on which FERC relied in reaching its decision to approve the transfer. In considering their contentions we address first the procedural issues, and then turn to the substantive challenges.

### A.

Wisconsin's procedural challenge to FERC's approval of the license transfers amounts to an attempt to force FERC to undergo a broad, essentially unlimited inquiry into the transferee's financial situation and to reconsider the economic viability of the two projects in light of environmental measures likely to be imposed in the future. Neither the statute nor FERC's regulations require it to engage in such an undertaking.

■ Wisconsin first contends that by not convening a formal evidentiary hearing concerning the license transfer applications, FERC violated its own rule of procedure, 18 C.F.R. § 385.505, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 554. However, as FERC points out, § 385.505, which grants participants in an evidentiary hearing the right to present evidence, does not create an independent right to the hearing itself; the regulation only applies when FERC has already set a matter for evidentiary hearing pursuant to 18 C.F.R. § 385.502. Nor does the APA guarantee an unqualified right to an evidentiary hearing. Rather, as the court stated in *Conoco, Inc. v. FERC*, 90 F.3d 536, 543 n. 15 (D.C.Cir.1996), FERC " 'is required to hold hearings only when the disputed issues may not be resolved through an examination of written submissions.' " (quoting *Environmental Action v. FERC*, 996 F.2d 401, 413 (D.C.Cir. 1993) (citations omitted). Wisconsin has pointed to no evidence in the record, and was

unable to identify anything at oral argument, that created a dispute of material fact requiring resolution through a formal evidentiary hearing. *See Citizens for Allegan Cty., Inc. v. Federal Power Commission,* 414 F.2d 1125, 1128 (D.C.Cir.1969).

 Second, Wisconsin contends that even if FERC were not required to convene a formal evidentiary hearing, FERC violated its own regulation governing summary dispositions. Section 385.217 provides, in relevant part:

> If a decisional authority, other than the Commission, is considering summary disposition of a proceeding, or part of a proceeding, in the absence of a motion for summary disposition by a participant, the decisional authority will grant the participants an opportunity to comment on the proposed disposition prior to any summary disposition, unless, for good cause shown, the decisional authority provides otherwise.

18 C.F.R. § 385.217(c)(2). Wisconsin maintains that under this regulation it was entitled to an opportunity to comment on the Division Director's proposed summary determinations before they were issued, and not simply a right to seek rehearing by FERC after the fact. FERC responds that Wisconsin did have the opportunity to comment before the Division Director rendered his decisions because, in its Notices of Application For Transfer of License and Approval of Lease, issued more than four months before the Director's decisions, FERC invited comments, protests, or motions to intervene, and in response, Wisconsin moved to intervene in opposition to the transfers. However, when Wisconsin filed its motions to intervene, all it had to comment on was FERC's Notices of Application, which gave no indication of the Division Director's proposed dispositions. Further, under § 385.217, the opportunity to comment applies to "participants," which include any "person[s] whose intervention in a proceeding is effective under [§ 385.214]," 18 C.F.R. § 385.102, and because Wisconsin

filed motions to intervene, not notices of intervention, it did not become a "participant" until its motions were granted, *id.* § 385.214(a)(2), (c)(2), in the same orders that approved the license transfers. In any event, Wisconsin's contention that FERC acted contrary to § 385.217 was not raised until oral argument in this court; in its initial brief Wisconsin stated only that the instant case "appear[s] summary in nature." More critically, Wisconsin did not raise this argument in its petitions for rehearing, and consequently, the contention is not properly before the court. *See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 962 F.2d 27, 34–35 (D.C.Cir.1992). In addition, Wisconsin has no basis on which to maintain that FERC itself (as opposed to the Division Director) violated § 385.217 by failing to provide an opportunity to comment on its decisions denying rehearing because, when FERC is the decisional authority, it is within FERC's discretion to decide whether to afford an opportunity to comment. 18 C.F.R. § 385.217(c)(3).

Finally, because, as counsel conceded at oral argument, Wisconsin never asked to see the documents on which FERC relied, including the power purchase agreement and the financial projections supporting FERC's initial license grant to Menominee, Wisconsin's objection to its lack of access to relevant documentation rings hollow.

### B.

We now turn to Michigan's substantive attacks on FERC's decisions to approve the license transfers.[3] Michigan first challenges FERC's finding of current economic viability for the Menominee/Park Mill Project. In deeming the Menominee project economically viable, FERC adopted the Division Director's finding, which was based on the original March 1985 determination of the project's viability and on the 1995 power purchase agreement between Menominee and NEW. Michigan contends that neither of these fac-

---

**3.** While Wisconsin also contends that FERC's decision approving the transfers is unsupported by the evidence, it focuses on its lack of opportunity to examine and challenge the evidence. Because its substantial evidence claim amounts to a restatement of its procedural objections, we need not address it again.

tors provided sufficient evidence to support FERC's decision. We disagree.

■ In maintaining that the March 1985 order alone does not demonstrate the project's economic viability, Michigan objects that the documents on which FERC relied in making its 1985 determination were not part of the record. While acknowledging the presence in the record of two documents predating the March 1985 order that provide information on the project's viability, Michigan maintains that those documents were received by FERC in May 1985, and thus could not form the basis for FERC's original decision. This contention is meritless. Regardless of whether FERC actually relied upon those documents in reaching its 1985 decision—Michigan concedes that it may not now collaterally attack that 1985 order, *see Raton Gas Transmission Co. v. FERC*, 852 F.2d 612, 615 (D.C.Cir.1988)—they are part of the record in the instant proceeding. Moreover, FERC need not again identify and provide the materials that supported its initial grant of the license nearly twelve years ago. It is FERC's established, and we conclude reasonable, practice in transfer proceedings to rely, absent changed circumstances, on earlier findings rendered in the license grant proceedings for evidence of a project's economic viability. *Rancho Riata Hydro Partners, Inc.*, 54 FERC ¶ 61,253 (1991); *Niagara Mohawk Power Corp.*, 32 FERC ¶ 61,291 (1985).

■ Michigan's objection to FERC's reliance on the power purchase agreement for its finding of economic viability is likewise meritless. Michigan maintains that although the Division Director mentioned the agreement in his order, it is unclear whether the Director actually had an opportunity to examine the agreement because the transfer application only indicated the existence of a contract and did not provide any details as to its terms. The power sales contract was not filed in the record of the instant proceeding until November 28, 1995, which, as Michigan points out, was after the deadline for filing a petition for rehearing, and in fact three months after Michigan filed its rehearing request. Yet, as Michigan acknowledges, FERC, which referenced some of the specif-

ics of the power purchase agreement in its opinion denying rehearing, did have the agreement when it rendered its ultimate decision approving the license transfer. Contrary to Michigan's contentions, the fact that FERC did not specify in its order whether it relied on this evidence or "explain how the evidence supports the conclusion with respect to the financial capacity of the transferee to fulfill the terms of the license" does not render its determination invalid. Not only is our assumption that FERC acts reasonably in arriving at its decisions, *cf. United States Dept. of the Interior*, 952 F.2d at 543; *Mine Reclamation Corp.*, 30 F.3d at 1524, not undermined by any evidence offered by Michigan, FERC's statement that Scott was required to purchase the project's net electrical energy adequately indicated why the power purchase agreement supported a finding that the project was economically viable. Even assuming it might have been preferable for FERC to spell out in greater detail the significance it attached to this evidence, there is no basis for the court to conclude that the evidence on which FERC relied did not support its finding of the project's economic viability.

■ Michigan further contends that even if FERC's finding of the project's current economic viability was supported by substantial evidence, FERC's decision to approve the license transfer on the basis of the current economic viability of the project was arbitrary and capricious. Noting both a pending entrainment study filed by Menominee that may result in the installation of fish protection measures, and the Menominee River Fisheries Plan, which calls for fish passage measures to be installed at the project in 2015, Michigan maintains that such measures may sufficiently increase costs so as to render the project economically unviable. In the event that NEW lacks adequate resources to cover the costs of decommissioning the project, Michigan contends that this burden may ultimately be borne by the state's taxpayers. Michigan thus challenges as unreasonable FERC's decision to defer consideration of the potential cost of these measures until relicensing, and to approve

the transfer without examining the transferee's financial resources.

FERC was under no statutory duty to require the transferee NEW to submit estimates of mitigation costs or a statement of its financial resources. *See* 18 C.F.R. §§ 4.61(d)(2), 9.2. As FERC correctly points out, transferees must demonstrate the same qualifications as license applicants. *Id.,* § 9.2. Because original license applicants for dam projects that generate less than 5 megawatts, as does the Menominee/Park Hill Project, need not submit estimates of mitigation costs and statements of financing sources, *id.* § 4.61(d)(2), transferees are also free from any such obligation. With respect to small projects, as FERC explained in denying rehearing, "the project's economic viability is the most significant determinant of the licensee's ability to pay for the required environmental measures." 74 FERC ¶ 61,023 at 61,068 (1996).

In other contexts, the court has recognized that despite the absence of explicit statutory directives, FERC may sometimes be required to collect information to determine whether particular measures are necessary to preserve the public interest. In *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109 (D.C.Cir.1989), for example, petitioners challenged FERC's refusal to undertake an assessment to determine whether environmental protection conditions should be imposed on a temporary dam license. Despite FERC's assertion that "necessary information would be developed and addressed during the relicensing proceeding," the court held that FERC's refusal to initiate an inquiry was an arbitrary and capricious exercise of discretion. *Id.* at 114, 199. The court explained, "[a]dmittedly, a bareboned request to collect information about the need for protective conditions could be summarily dismissed, but here there was considerable evidence laid before the Commission to trigger its attention to the problem." *Id.*

Wisconsin's and Michigan's request that FERC resolve the question of mitigation costs and investigate further into the transferee's financial status before granting the license transfer was just such a "bareboned

request." Neither presented FERC with any evidence to support the doubts they sought to raise concerning NEW's ability to assume the responsibilities under the licenses. Well aware that certain environmental measures may be required for the dams' continued operation, FERC has already initiated a separate proceeding to address this matter. At this point, neither FERC nor Wisconsin or Michigan can predict with any certainty whether, and in what form, such requirements may eventually be imposed. Moreover, as FERC noted, the transferee has agreed to comply with all the terms and conditions of the licenses, which would include any environmental measures that may become necessary, and neither Wisconsin nor Michigan has presented any evidence that calls into question NEW's commitment or ability to do so. Using Michigan's own estimates of costs and revenues, FERC found that NEW had adequate financial resources to operate and maintain the projects. Although Michigan objected that FERC simply applied Michigan's revenue projections without making its own independent revenue determination, Michigan never provided any evidence to suggest that, as applied by FERC, Michigan's projections were unreliable. In the absence of any evidence to suggest that the projects were likely to become marginal or to be abandoned by the transferee, FERC could reasonably conclude that consideration of the impact of future environmental controls on the projects' economic viability was better deferred until such measures were actually imposed at the time of relicensing, and that the possibility that the projects might be decommissioned due to their economic unviability was too speculative to warrant requiring NEW to submit additional financial documentation.

▆▆▆▆ FERC's approvals of the Menominee/Park Mill and Oconto Falls license transfers were supported by substantial evidence in the record and were the product of reasoned decision-making. Because, in the absence of the transfers, FERC would have been under no obligation to assess the availability of adequate financial resources to undertake potential future environmental measures, and because the transfer provisions do

not require FERC to reevaluate the financial status of existing projects, 18 C.F.R. § 9.3(a), FERC reasonably could conclude that the transfer of economically viable projects to a transferee willing and able to maintain the projects for the lifetime of the licenses was in the public interest. Wisconsin's and Michigan's understandable, but unsubstantiated, concerns do not compel another conclusion. Even assuming, from our perspective, that it might have been preferable for FERC to engage in a more probing inquiry into the financial status of the transferee, Congress has vested in FERC the primary responsibility of carrying out the provisions of the Federal Power Act, 16 U.S.C. §§ 791a–825r, and the FERC determinations that Wisconsin and Michigan attack are precisely the type of decisions that are best left to the expertise of the regulatory agency. *See United States Dept. of the Interior,* 952 F.2d at 543; *Mine Reclamation Corp.,* 30 F.3d at 1524. Given the lack of any evidence to cast doubt on FERC's conclusions that the projects are viable and that decommissioning is not anticipated, Wisconsin's and Michigan's challenges fail.

Accordingly, we deny the petitions.