# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 13, 2005     Decided October 28, 2005

No. 04-1248

ICO GLOBAL COMMUNICATIONS (HOLDINGS) LIMITED,
ET AL.,
APPELLANTS

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

---

Appeal of an Order of the
Federal Communications Commission

---

*Seth M. Galanter* argued the cause for appellant. With him on the briefs were *Robert A. Mazer*, *James H. Bailey*, and *Phuong N. Pham*.

*Stewart A. Block*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Austin C. Schlick*, Acting General Counsel, and *Daniel M. Armstrong*, Associate General Counsel. *John A. Rogovin*, Counsel, entered an appearance.

Before: RANDOLPH and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  Appellants ICO Global Communications (Holdings) Ltd.,[1] Constellation Communications Holdings, Inc., and Mobile Communications Holdings, Inc. are licensees who had been authorized by the FCC to provide mobile satellite services using the 2 GHz frequency band.  They seek review of a Federal Communications Commission order finding that Constellation and Mobile had not satisfied the first of several "milestone" requirements on which their licenses had been conditioned. See *In the Matter of Joint Application for Review of Constellation Communications Holdings, Inc., et al.*, 19 FCC Rcd 11,631 (2004) ("*Constellation/Mobile Order*"). Appellants argue that Constellation and Mobile had in fact satisfied the first milestone requirement by entering a set of satellite-sharing agreements with ICO and that the FCC's rejection of the agreements was inconsistent with the relevant precedent.  We disagree.

* * *

The Commission imposes its milestone requirements on spectrum licensees in order to "ensure speedy delivery of service to the public" and to "prevent warehousing of valuable

---

[1] We follow the lead of the FCC and refer to both ICO Services Ltd. and its parent, ICO Global Communications (Holding) Ltd., as simply "ICO."  See *In the Matter of Joint Application for Review of Constellation Communications Holdings, Inc., et al.*, 19 FCC Rcd 11,631, 11,638 n.48 (2004).  The latter is the named party in this case, but the FCC issued a 2 GHz license to the former.

orbital locations and spectrum." See *In the Matter of the Establishment of Policies and Service Rules for the Mobile Satellite Service in the 2 GHz Band*, 15 FCC Rcd 16,127, 16,177, ¶ 106 (2000) ("*2 GHz MSS Order*"). It sees "warehousing" not only as impeding prompt service delivery but also as allowing a licensee to "block[] entry by other entities willing and able to proceed immediately with the construction and launch of their satellite systems." *Constellation/Mobile Order*, 19 FCC Rcd at 11,632-33, ¶ 2. Appellants don't question these policy judgments.

To meet the first milestone, licensees must enter into "non-contingent" satellite-manufacturing contracts within one year of receiving their licenses. *2 GHz MSS Order*, 15 FCC Rcd at 16,177, ¶ 106. Meeting this first milestone is particularly important, says the FCC, because "it provides an early objective indication of whether a licensee is committed to proceeding with implementation of its proposal." *Constellation/Mobile Order*, 19 FCC Rcd at 11,635, ¶ 7. The FCC uses additional milestones to assess further progress in constructing and launching satellites. See *2 GHz MSS Order*, 15 FCC Rcd at 16,177, ¶ 106. It enforces the milestone requirements by canceling licenses automatically if licensees fail to comply. *Id*.

In July 2001 the FCC granted licenses for mobile satellite service in the 2 GHz band to eight firms including ICO, Constellation, and Mobile. ICO then entered into a satellite-construction contract with Boeing Satellite Systems International, Inc., and in February 2003 the FCC announced that ICO had passed the first milestone. *2 GHz MSS Systems in Compliance with First Milestone Requirement*, 18 FCC Rcd 1732 (2003).

Shortly before Constellation's and Mobile's deadlines for meeting the first milestone, those firms entered a set of satellite-sharing agreements with ICO.[2] Under the satellite-sharing agreements, Constellation and Mobile agreed to purchase title to channels on ICO's satellites. Constellation and Mobile would gain access to those channels once they became available for commercial services and would use them to provide independent services to their customers. *In re Applications of Mobile Communications Holdings, Inc. and ICO Global Communications (Holdings) Ltd.*, 18 FCC Rcd

---

[2] Constellation and Mobile also entered into a set of stock-purchase agreements with ICO. Under these agreements, ICO would purchase all of Constellation's and Mobile's stock in a two step process and would receive their licenses in exchange. If the stock-purchase agreements had received the requisite FCC approval and been consummated, they would have superseded the sharing agreements. See *In re Applications of Mobile Communications Holdings, Inc. and ICO Global Communications (Holdings) Ltd. for Transfer of Control*, 18 FCC Rcd 1094, 1096 ¶¶ 5-6 (Int'l Bureau 2003).

Our opinion will not address the stock-purchase agreements because appellants rely only on the sharing agreements to argue that they satisfied the first milestone requirement. Appellants' opening brief does suggest that had the Commission first—and favorably—addressed the proposed license transfers contained in the stock-purchase agreements, Constellation and Mobile would have been credited with the Boeing contract and thus would have passed the first milestone. See Br. for Appellants 27-28. But we can find no claim for such a sequencing in their applications for Commission review, and as a result we don't consider this contention. See 47 U.S.C. § 405(a).

1094, 1095, ¶ 4 (Int'l Bureau 2003) ("*Int'l Bureau Order*"). Constellation and Mobile argued that they satisfied the first milestone requirement by executing the sharing agreements with ICO. Affidavit Accompanying Letter from Robert A. Mazer, Counsel for Constellation Communications Holdings, Inc., to Marlene H. Dortch, Secretary, FCC (July 29, 2002); Declaration Accompanying Letter from Tom Davidson, Counsel for Mobile Communications Holdings, Inc., to Marlene H. Dortch, Secretary, FCC (July 29, 2002).

The FCC's International Bureau determined that Constellation's and Mobile's agreements with ICO did not constitute non-contingent satellite-construction contracts and declared their licenses null and void for failure to satisfy the first milestone requirement. *Int'l Bureau Order*, 18 FCC Rcd at 1103, ¶ 24. The FCC affirmed the International Bureau's conclusion regarding the first milestone, see *Constellation/Mobile Order*, 19 FCC Rcd at 11,640, ¶ 18, and rejected appellants' argument that the FCC's precedents provided insufficient notice of the limits that the FCC was placing on the use of sharing agreements to meet milestone requirements, *id*. at 11,646-48 ¶¶ 32-36. The FCC also affirmed the International Bureau's denial of a waiver request, *id*. at 11,648-49 ¶ 39 and rejected the argument that it had violated 47 U.S.C. § 312 by failing to provide appellants a hearing before canceling their licenses, *id*. at 11,650 ¶ 42. Appellants contest each of these four aspects of the FCC's decision, and we address them in turn.

\* \* \*

Under the Administrative Procedure Act we are to uphold the FCC's order unless it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

In evaluating whether appellants' satellite-sharing agreements satisfied the first milestone requirement, the FCC invoked its earlier order, *In re Applications of Tempo Enterprises, Inc. et al.*, 1 FCC Rcd 20 (1986). There, the FCC articulated a number of factors that it believed showed that the satellite licensee had successfully met the first milestone:

> There is a contract, signed by both parties, which contains no unresolved contingencies which could preclude substantial construction of the satellites. . . . Specific satellites and their design characteristics are identified, and dates for the start and completion of construction are specified. The payment terms and schedule are described sufficiently to demonstrate the parties' investment/commitment to completion of the system. While the payments are not evenly spread through the contract term, the initial payments are significant, and the majority of payments are due during the middle phases, well before the end of the construction period. The major milestones in the construction schedule are provided, and with the payment schedule, establish the certainty of the plan and the reasonableness of its projection for timely completion.

*Id*. at 21, ¶ 7. Although appellants are correct that the FCC gave no indication in *Tempo* itself that it intended the decision to establish a general minimum standard, at least one FCC order that preceded appellants' actions here identified *Tempo* as "articulat[ing] the basic foundation for demonstrating compliance" with the first milestone requirement (referred to there as the first component of the

due diligence requirement).  See *In re Applications of United States Satellite Broadcasting Co. et al.*, 7 FCC Rcd 7247, 7250, ¶ 19 (1992) ("*USSB*").

The key problem the FCC identified with the sharing agreements is that they "did not commit either Constellation or [Mobile] to implement[ing] the proposed satellite system they were licensed to operate." *Constellation/Mobile Order*, 19 FCC Rcd at 11,640, ¶ 19.  While Constellation and Mobile each paid a $1 million deposit to ICO, this amount "comprised less than one-half of one percent of the total purchase price specified in each contract." *Int'l Bureau Order*, 18 FCC Rcd at 1100, ¶ 17.   Nor did the agreements require any additional payments from Constellation and Mobile until ICO's satellites were launched, in sharp contrast with the *Tempo* contract, where "the majority of payments [were] due during the middle phases, well before the end of the construction period." *Tempo*, 1 FCC Rcd at 21, ¶ 7.

Even more problematic for appellants are the contractual consequences of breaching the sharing agreements.  If ICO breached, the only penalty it would incur is the obligation to refund Constellation's and Mobile's $1 million deposits.  See *Constellation/Mobile Order*, 19 FCC Rcd at 11,647-48, ¶ 36; *Int'l Bureau Order*, 18 FCC Rcd at 1100 n.28.  The sharing agreements gave Constellation and Mobile no leverage to ensure that Boeing completed construction of ICO's satellite system in a timely manner, and, even if Boeing did so, that ICO would follow through with the transfer of channel capacity.

Constellation's and Mobile's lack of financial commitment to the transaction was thus nicely matched by ICO's.  ICO was pretty much free to pull out at any time.

And if it did so at the end of satellite construction, Constellation and Mobile would be back at square one, no closer to providing mobile satellite services than they were on the day the FCC issued their licenses. During that time, the spectrum assigned to them would have been unavailable to other entities including those willing and able to start construction immediately. While ICO's satellite-construction contract evidently would have created enough new capacity for three licensees, that circumstance would not have been the result of Constellation's or Mobile's making any commitment or any exertion whatsoever, and Commission policy focuses not on satellite capacity in relation to overall demand, but on individual licensees' contribution to the development of capacity.

* * *

Appellants also argue that they were deprived of their licenses without due process because the FCC had failed to provide advance notice either of its requirement that commitment be demonstrated by making substantial payments or of any ban on meeting the first milestone via a satellite-sharing agreement. Under our cases there is no due process violation if a regulated party acting in good faith is "able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Trinity Broadcasting v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (quoting *General Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)). As our discussion of *Tempo* and *USSB* should make clear, appellants did receive adequate notice of the financial commitment required. See also *In re Advanced Communications Corp.*, 11 FCC Rcd 3399, 3418-19, ¶ 50 (1995) (citing Advanced's lack of financial commitment to

satellite construction as reason for denying its request for milestone extension).

Appellants are mistaken in characterizing the FCC's order as implementing a rule against reliance on satellite sharing to meet the first milestone. The FCC properly explained that it would accept sharing agreements where the licensee can "demonstrate the same investment and commitment to completing the satellite system construction as if it were constructing the satellite system it was licensed to operate." *Constellation/Mobile Order*, 19 FCC Rcd at 11,650-51, ¶ 43. Thus, the cancellation of Constellation's and Mobile's licenses did not violate due process requirements.

\* \* \*

Appellants also challenge the FCC's denial of a waiver of the first milestone requirement. While the FCC must explain the reasons for its decision, see *WAIT Radio v. FCC*, 418 F.2d 1153, 1156 (D.C. Cir. 1969), our review is "extremely limited; we vacate such denials only when 'the agency's reasons are so insubstantial as to render that denial an abuse of discretion.'" *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181-82 (D.C. Cir. 2003) (citing *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C. Cir. 1999)). "The FCC may exercise its discretion to waive a rule where particular facts would make strict compliance inconsistent with the public interest." *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (quoting *WAIT Radio*, 418 F.2d at 1159). In the current case, the FCC affirmed the International Bureau's conclusion that granting a waiver would be contrary to the public interest because it "would establish a precedent that would undercut efforts to limit

warehousing of scarce orbit and spectrum resources." *Constellation/Mobile Order*, 19 FCC Rcd at 11,648, ¶ 38. On the Commission's unchallenged policy premises, that conclusion is no abuse of discretion.

Appellants urge the court to evaluate the FCC's denial in light of its grant of a waiver to another 2 GHz licensee in *TMI Communications & Co.*, 19 FCC Rcd 12,603 (2004), which the FCC released several days after its order in the current case. The Commission makes two arguments against our even considering *TMI,* but neither is persuasive. It first invokes 47 U.S.C. § 405(a), which conditions judicial review of an issue on the filing of a request for FCC reconsideration unless the Commission has otherwise had an opportunity to pass on the issue. Here the Commission did have an opportunity to pass on the consistency of its waiver decision with its decision in *TMI*: in fact, a dissenting Commissioner expressed his preference for "granting a waiver as we did in the related *TMI* case." *Constellation/Mobile Order*, 19 FCC Rcd at 11,653 (dissenting statement of Comm'r Copps). See *Office of Communication of United Church of Christ v. FCC*, 465 F.2d 519, 523 (1972) ("It would be blindly ignoring the realities of administrative decision-making to say that the majority had no opportunity to consider the objections raised by the dissenters . . . ."). Second, the Commission says that it has no obligation to explain any inconsistency with *TMI* because it issued *TMI* slightly after the present decision. But we've held that the Commission may not refuse to explain apparent inconsistencies in decisions issued "at virtually the same time." See *Melody Music, Inc. v. FCC*, 345 F.2d 730, 732-33 & n.4 (D.C. Cir. 1965). The record doesn't explain Commissioner Copps's reference to a later decision, but we note that the "adoption" date of *TMI* precedes the "release" date for the present decision.

On the merits, however, we find no inconsistency. To satisfy the first milestone requirement, TMI, a Canadian partnership holding both a Canadian license and a United States "reservation of spectrum" in the 2GHz band, arranged for satellite construction via a contract between TerreStar, a corporation created and wholly owned by a partnership in which TMI held a 40% share of equity and a quarter of the voting rights, and Space Systems/Loral, a designer and builder of satellites. The latter partnership brought substantial U.S. financial resources into the picture—resources that, the FCC says, could not have come in via investment in TMI because of Canadian rules evidently requiring at least 80% Canadian ownership of any Canadian licensee. *TMI*, 19 FCC Rcd at 12,618, ¶ 40-41 & n.89. The FCC evaluated the TerreStar-Loral contract's provisions regarding timing of construction and of payments and found them satisfactory, *TMI*, 19 FCC Rcd at 12,610, ¶ 21, 12,618, ¶ 42, a conclusion with which appellants do not quarrel.

The problem, according to the FCC, was that while the contents of the contract were adequate to meet the first milestone, TMI itself was not a party and thus was not on the hook financially to a degree that reflected the requisite commitment to the timely completion of the project. The FCC reached this conclusion even though "TMI appears to stand to suffer some financial loss if the satellite is not constructed as a result of its 40 percent ownership of TerreStar's parent company." *Id*. at 12,619, ¶ 44. To cure this problem the FCC attached a condition to its waiver: it required TMI to "obligate itself to cover TerreStar's future satellite construction contract expenditures, by entering into a guarantee or reimbursement agreement with TerreStar and/or Loral, or by some similar arrangement." *Id*. at 12,620, ¶ 45.

Not only did TMI come very close to meeting the *Tempo* standard, but the gap between its commitment and that normally required was due to a special legal obstacle, the Canadian limit on non-Canadian investment in Canadian licensees. The FCC concluded that in combination with the condition attached to the waiver, these factors were enough to support a waiver. *Id*. at 12,620, ¶ 47. Because each is absent in the current case, there is no inconsistency with *TMI* and no abuse of discretion.

\* \* \*

Finally, appellants argue that because the FCC cancelled Constellation's and Mobile's licenses without an order to show cause and without an evidentiary hearing, it violated 47 U.S.C. § 312. Section 312(a) permits the Commission to revoke a station license or construction permit for any of seven enumerated reasons; section 312(c) then requires an order to show cause and an evidentiary hearing before the Commission "revok[es] a license or permit pursuant to subsection (a)." Appellants do not argue that the Commission's cancellation order rested on any of seven enumerated reasons. Rather, they argue that if the cancellation order rests on any other reason, it lacks any statutory foundation at all.

We are somewhat skeptical of appellants' theory that § 312(a) establishes the exclusive means for termination of a license or permit. Compare § 319(b), which provides that a construction permit is to be "automatically forfeited" if a station isn't ready for operation within the time specified by the Commission. In any event, assuming the applicability of § 312(c), a hearing is unnecessary where it would be pointless because (for instance) the matter turns entirely on issues of

law and policy. See *Citizens for Allegan County, Inc. v. Federal Power Commission*, 414 F.2d 1125, 1128 & n.5 (D.C. Cir. 1969) (holding that agency may permissibly omit a hearing "where there is no dispute on the facts and the agency proceeding involves only a question of law"); see also *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 201-05 (1956); *Wisconsin v. FERC*, 104 F.3d 462, 467-68 (D.C. Cir. 1997). Appellants argue that a hearing would have offered them an opportunity to cure any perceived noncompliance. The purpose of a hearing under § 312(c) is not to offer licensees an opportunity to take remedial measures, however, but is explicitly for parties to "give evidence"—and appellants proffer none. Thus we are confident that here § 312(c) required no procedures in addition to those the Commission furnished.

* * *

Accordingly, the orders are

*Affirmed*.